UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Ordos City Hawtai Autobody Company, Ltd.
and Inner Mongolia OED Engine Company,
Ltd.,

       Plaintiffs,

v.                                                    Case No. 13-14909
                                                      Honorable Sean F. Cox

Dimond Rigging Company, LLC d/b/a
Absolute Rigging & Millwrights,

       Defendant.
_____/

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (Doc. #97)**

This case is, chiefly, a breach of contract action.  Plaintiffs Ordos City Hawtai Autobody

("Ordos") and Inner Mongolia OED Engine Company, Ltd. ("Inner Mongolia") (collectively,

"Plaintiffs") allege that Defendant Dimond Rigging Company, LLC, d/b/a Absolute Rigging &

Millwrights ("ARM") breached several contracts requiring ARM to dismantle, pack, care for and

ultimately transport two large pieces of automotive manufacturing equipment to Plaintiffs in China.

Defendant denies that it breached any of the parties' contracts, and asserts several counterclaims

against Plaintiffs.  Defendant has demanded a trial by jury.

This matter is before the Court on Plaintiffs' Motion for Summary Judgment pursuant to Fed.

R. Civ. P. 56.  (Doc. #97).  Plaintiffs seek summary judgment in their favor on all nine of

Defendant's counterclaims.  (Doc. #97).  Plaintiffs also seek entry of judgment as to liability on

Count Four of the Verified Complaint. Defendant did not timely respond to Plaintiffs' motion.[1] For the reasons set forth below, the Court shall GRANT Plaintiffs' motion.

## BACKGROUND

### A. Factual Background

Plaintiffs Ordos and Inner Mongolia are wholly-owned subsidiaries of Hawtai Motor Group ("Hawtai"). (Joint Stip. Facts regarding Prelim. Inj. Hrg., Doc. #30 at ¶ 1). Hawtai, Ordos and Inner Mongolia are organized under the laws of China, and their principal places of business are in China. (*Id.*) Defendant ARM is a Michigan limited liability company located in Birmingham, Michigan. (Joint Stip. Facts at ¶ 2).

In 2011, Plaintiffs purchased two pieces of automotive manufacturing equipment from a closing Chrysler plant in Twinsburg, Ohio. The first piece of equipment was a used Vernon Press and a used Schuler Cut to Length Press, including an ASRS system ("Line 7 Equipment"). (Invoice, Pl. Ex. A). Plaintiffs also purchased a 2002 Schuler Crossbar Line ("Line 15 Equipment"). (Joint Stip. Facts ¶ 10).

Through the execution of several contracts, Plaintiffs hired ARM to perform rigging work on the purchased equipment and to arrange for the shipment of the equipment from Ohio to China. On March 31, 2011, Ordos entered into four contracts with ARM for the washing, packing, and rigging of all of the Line 7 Equipment. (Line 7 Rigging Agreements, Pl. Ex. D). The Line 7 Rigging Agreements all contain merger clauses that state:

> This Agreement constitutes the complete and exclusive statement of the terms and conditions between the parties, which supersedes and merges all prior proposals,

---

[1] As will be discussed in further detail below, Defendant attempted to file a tardy response to Plaintiffs' motion but the Court disallowed the filing.

understandings and all other agreements, oral and written, between the parties
relating to the subject of this Agreement.

(Pl. Ex. D at Page ID## 1244, 1247, 1255, 1261, 1267).

On June 7, 2011, Ordos and ARM entered into a contract under which ARM agreed to
arrange for the transportation of the Line 7 Equipment from Ohio to China. (Pl. Ex. E). Among
other things, the Line 7 Transportation Agreement states that "the Contract Price of the services . .
. is $1,250,000 which covered the cost for, including but not limited to . . . Leasing or purchasing
shipping containers . . . ." (Pl. Ex. E § 1.3). The Line 7 Transportation Agreement provides that
"Customer [Inner Mongolia] will not be responsible for any more payment beyond the Contract
Price." (*Id.* at § 1.5). The Line 7 Transportation Agreement also contains a merger clause identical
to the one contained in the Line 7 Rigging Agreements. (Pl. Ex. E at § 5.6). According to Alan
Hseuh ("Hsueh"), an employee and agent of Ordos, Ordos paid ARM the full Contract Price due
under the Line 7 Transportation Agreement. (Declaration of Alan Hsueh, Pl. Ex. F at ¶ 2; Pl. Ex.
F at Attachment 1 p. 2).

On August 29, 2011, Inner Mongolia and ARM entered into a Rigging Agreement by which
Inner Mongolia agreed to pay $760,000 to ARM in exchange for ARM's "rigging, dismantling,
washing, packing, and loading of the Line 15 Equipment." (Joint Stip. Facts at ¶ 4; Line 15 Rigging
Agreement, Pl. Ex. G). The Line 15 Rigging Agreement provides, in pertinent part:

> 1.1   Rigger will provide rigging and dismantling services to Customer for the
>        Crossbar Line at the Twinsburg Plant. The work includes, but not limited to:
>
>        1.1.1   Provide enough labor and all necessary equipments at the Twinsburg
>                Plant to rig and dismantle the Crossbar Line;
>
>        . . . .

3

    1.9      Rigger should ask for information from the Seller "Maynards" and based on Rigger's site-visit and its experience regarding to which equipment is to be dismantled and packaged. Customer will not be responsible for any delay or extra charges caused by misjudgment of the scope of the work.

    1.10   Rigger has conducted an on-site plant inspection, and is fully aware of the quotes in this contract. Rigger agrees that no additional charges will be granted during the execution of this contract.

(Line 15 Rigging Agreement, Pl. Ex. G at pp. 1, 3). Ronald Lech, President of ARM, admitted at the May 9, 2014 injunction hearing that the Line 15 Rigging Agreement covered all of the Line 15 Equipment and contemplated the transportation and dismantling of the entire Line 15 machine. (Lech Trans., Pl. Ex. H at 32–33).

On November 3, 2011, Plaintiff Inner Mongolia and ARM executed a contract under which ARM agreed to transport the Line 15 Equipment from Twinsburg, Ohio to China. (Line 15 Transportation Agreement, Pl. Ex. I). The Line 15 Rigging and Transportation Agreements contain merger clauses identical to those contained in the contracts concerning the Line 7 equipment. (Pl. Ex. G at p. 7; Pl. Ex. I at p. 4).

Plaintiffs claim that ARM "transported much of the Line 7 Equipment to China by ocean vessel in late 2011/early 2012." (Pl. Stmt. of Facts, ¶ 17). As required by the Line 7 Transportation Agreement, ARM procured insurance for the Line 7 Equipment from Traveler's Insurance Company ("Traveler's). (*See* Claim Correspondence, Pl. Ex. J). Plaintiffs have not submitted a copy of ARM's insurance policy with Traveler's.

On January 12, 2012, while some of the Line 7 Equipment was en route to China, the ship was caught in a storm in the North Sea. (Insurance Claim Correspondence between ARM and Traveler's, Pl. Ex. J at Page ID #1310). The Line 7 elevator was lost at sea and several containers

were damaged.  (*Id.*)

On January 16, 2012, ARM filed a claim with Traveler's for Ordos's lost elevator.  (Claim Correspondence, Pl. Ex. J).  On or about February 19, 2013, Traveler's paid $975,000 to ARM to cover ARM's claim for the lost elevator.  (Claim Payment Documentation, Pl. Ex. K at Page ID# 1342, 1349).  According to Hsueh, ARM paid no portion of the claim proceeds to Ordos, nor did ARM ever provide a replacement elevator to Ordos.  (Hsueh Declaration, Pl. Ex. F at ¶ 3).

On May 7, 2013, the parties executed an Amended Transportation Agreement, under which Plaintiffs agreed to pay ARM an additional $700,000 in order for ARM to complete the Line 7 and Line 15 transportation services.  (Amended Trans. Agreement, Pl. Ex. L).  The Amended Transportation Agreement also states that ARM "acknowledges that it has obtained approval from the insurance company to begin obtaining or constructing the Line 7 equipment, specifically the elevator, lost at sea January 2012."  (Amended Trans. Agreement, Pl. Ex. L at p. 2).  Ordos ultimately paid ARM $500,000 pursuant to the Amended Transportation Agreement.  (Pl. Ex. F at Attachment 1).

The Line 15 Transportation Agreement called for ARM to transport the Line 15 Equipment to Cleveland, Ohio on or before December 30, 2011 in preparation for departure to China.  (Line 15 Trans. Agreement, Pl. Ex. I).  ARM did not complete the transportation of the Line 15 Equipment to Cleveland before December 30, 2011.  ARM transported some portions of the Line 15 Equipment to China in August 2013.  (Joint Stip. Facts ¶ 8).

In September 2013 through November 2013, ARM performed additional millwright work on the remaining pieces of Line 15 equipment still located in Twinsburg, Ohio.  (Joint Stip. Facts at ¶ 9; Lech Trans., Pl. Ex. H at 10–12). Defendant then transported some of the Line 15 Equipment

5

to its property in Hastings, Michigan.  (Joint Stip. Facts at ¶ 9).

On November 19, 2013, ARM issued an Invoice to Inner Mongolia in the amount of $226,850.00 for the millwright work performed on the Line 15 Equipment in Twinsburg.  (Invoice, Pl. Ex. O).  On November 15, 2013, ARM posted a "Lien Notice" on the Line 15 Equipment in Twinsburg.  (Lien Notice, Pl. Ex. N).  The Lien Notice stated: "UNDER OHIO LAW, THE EQUIPMENT TO WHICH THIS NOTICE IS POSTED IS SUBJECT TO AN ARTISAN'S LIEN FOR MILLWRIGHT WORK PERFORMED BY" ARM.  (Pl. Ex. N).

ARM never completed transportation of the Line 15 Equipment to China and Plaintiffs never paid ARM the amount charged for the additional millwright work.  On November 27, 2013, Plaintiffs' counsel e-mailed ARM and notified it that it "consider[ed] the Agreements terminated immediately based on ARM's breaches and repudiation."  (Rustmann E-mail to Biehl, Pl. Ex. Q).

**B.    Procedural History**

Plaintiffs filed their Verified Complaint on November 27, 2013.  (Doc. #1).  Plaintiffs allege six (6) counts against Defendant:

Count One:      Claim and Delivery

Count Two:      Conversion

Count Three:   Declaratory Relief

Count Four:     Breach of Contracts

Count Five:      Negligence

Count Six:       Unjust Enrichment

6

(Verified Compl., Doc. #1).[2]

On December 2, 2013, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. #3). Plaintiffs alleged that Defendant was in possession of the Line 15 Equipment and had not shipped it to China as required by their contract. (Doc. #3 at 1–2). Plaintiffs alleged that the Line 15 Equipment was "exposed to the elements" and was "degrading in condition and value." (Doc. #3 at 2). Plaintiffs sought a Temporary Restraining Order requiring Defendant to protect the Line 15 Equipment from damage, and a preliminary injunction order "compelling Defendant to immediately relinquish physical possession of Plaintiffs' equipment . . ." (Doc. #3 at 5).

On December 10, 2013, the Court entered a Stipulated Temporary Restraining Order that required Defendant to "refrain from damaging, destroying, concealing, disposing, or . . . substantially impair[ing] the value of" Plaintiffs' Line 15 Equipment. (Doc. #9). Shortly thereafter, Defendant filed a Motion to Dismiss based on an alleged arbitration agreement (Doc. #10), which this Court denied on April 10, 2014. (Doc. #28).

Defendant filed an Answer to the Complaint, along with Affirmative Defenses and Counterclaims, on April 24, 2014. (Doc. #35). Defendant filed Amended Counterclaims on August 6, 2014 (Doc. #73). The Amended Counterclaims asserted by Defendant are as follows:

Counterclaim One:    Breach of Written and Oral Agreements

Counterclaim Two:    Promissory Estoppel

---

[2] "[A] party's verified complaint may be considered as evidence in establishing a genuine issue of material fact . . . ." *Turney v. Catholic Health Initiatives*, 35 Fed. App'x 166, 168 (6th Cir. 2002).

7

Counterclaim Three:   Conversion

Counterclaim Four:   Intentional Interference With A Business Relationship

Counterclaim Five:   Fraudulent Inducement

Counterclaim Six:   Negligence

Counterclaim Seven:   Declaratory Relief

Counterclaim Eight:   Artisan's Lien and Lien Foreclosure

Counterclaim Nine:   Indemnity And/Or Contribution

(Amended Ctr. Claims, Doc. #73 at 16–25).

On April 28, 2014, April 30, 2014, May 1, 2014 and May 9, 2014, this Court held an Evidentiary Hearing on Plaintiffs' Motion for Preliminary Injunction. The Court issued an Opinion and Order Granting Plaintiffs' Motion for Preliminary Injunction on June 6, 2014. (Doc. #43). The Court ordered Defendant to "allow Plaintiffs to enter onto its property at Hastings, Michigan to remove all portions of the Line 15 Equipment that exist there." (Doc. 43 at 19).[3]

From this case's inception, the parties have been antagonistic with one another and have used the judicial process as a weapon, not a tool. The docket in this case is a reflection of the parties'

---

[3] As this case was progressing, the parties were also litigating in the Northern District of Ohio regarding a portion of the Line 15 Equipment that was located on property leased by Defendant in Twinsburg, Ohio. *Twinsburg Ind. Prop, LLC v. Dimond Rigging Company, LLC, et al.*, Case No. 14-00340, N.D. Ohio).

On April 15, 2014, Judge Sara Lioi in the Northern District of Ohio entered a Stipulated Order granting Inner Mongolia (a Plaintiff here) immediate possession over the Line 15 Equipment located in Defendant's possession in Twinsburg. Judge Lioi required Inner Mongolia to post bond in the form of a Letter of Credit, with ARM as the beneficiary, in the amount of $226,850. Here, this Court found that the Letter of Credit bond posted by Plaintiffs in the Ohio case adequately protected Defendant's interest in this case such that no additional bond was required.

litigiousness.  There are over 113 docket entries in what is a relatively simple breach of contract action that has only been pending for eighteen months.  Many of the parties' filings and much of the Court's time have been devoted to issues that could have been resolved amicably with the slightest bit of cooperation.

For example, this Court entered its Order Granting Plaintiffs' Motion for Preliminary Injunction on June 6, 2014. (Doc. #43).  This Court did not require Plaintiffs to post additional bond because it found that sufficient bond had already been posted in the Northern District of Ohio case. Five days after entry of the injunction order, Defendant was already complaining to the Court that Plaintiffs had failed to obtain the Letter of Credit.  (Def. Notice, Doc. #45).  Plaintiffs filed Notice that the Letter of Credit had been obtained one day later.  (Pls. Notice, Doc. #46).

In the Court's June 6, 2014 Order, the Court ordered the parties to work together to have Plaintiffs' Line 15 Equipment moved from Defendant's Hastings, Michigan property within sixty days.  On June 20, 2014, Plaintiffs filed an "Emergency" Motion to Enforce the June 6, 2014 Order, complaining that Defendant was not cooperating with Plaintiffs in getting the equipment removed, even though only two weeks had passed since issuance of the injunction and Plaintiffs did not have a trucking company hired and ready to move the equipment.  (Doc. #50).  At an expedited hearing on Plaintiffs' motion, the Court admonished the parties for wasting the Court's time by failing to follow this Court's orders,[4] failing to work to resolve issues without the Court's involvement, and

---

[4] There appears to have been some indication that Defendant did not comply with the TRO entered in this case.  (Stipulated TRO, Doc. #9).  The TRO, entered on December 10, 2013, required Defendant to maintain all of the Line 15 Equipment indoors, except to pieces that were too large to be stored indoors.  Those large pieces were to be shrinkwrapped.  In the spring of 2014, when Plaintiffs' representatives examined the Line 15 Equipment in Hastings, Michigan, they noted that the Line 15 Equipment stored outside was not shrinkwrapped.

9

unnecessarily claiming that a motion must be heard on an emergency basis. (June 27, 2014 Order, Doc. #53 at 3–4). The Court fined the parties in an effort to encourage the parties' respect for this Court and the judicial process. (Doc. #53).

Yet, the vexatious filings continued. On July 20, 2014, Defendant filed a "Motion For Relief from that part of the Court's June 26, 2014 Order Imposing a $2,000 Fine Upon Defendant's Owner." (Doc. #65). The Court denied that motion. (Order, Doc. #68).

On July 14, 2014, Defendant filed a "Motion to Set or Increase Injunction Bond; or Alternatively, Rule 60(b) Motion to Set Aside or Correct the Court's Order of June 6, 2014 Relieving Plaintiff's Duty to Post Separate Injunction Bond in this Matter." (Def.'s Mo., Doc. #59). Defendant also filed a Motion for Immediate Consideration of its Motion to Set or Increase Bond, (Doc. #58), which this Court denied. (Order, Doc. #67). In its motion, Defendant reiterated many of the same arguments advanced at the preliminary injunction stage on the bond issue. Defendant disagreed with this Court's determination that the Letter of Credit protected Defendant's lien interest, if any, in the Line 15 Equipment. (Doc. #59). The Court denied Defendant's motion, concluding (as the Court had already explained in its June 6, 2014 Order) that Defendant's purported lien rights were adequately protected by the Letter of Credit Plaintiffs had already been ordered to procure. (Order, Doc. #71).

The parties' antagonism and lack of communication infected the discovery process in this matter and resulted in more protracted and unnecessary litigation. The magistrate judge in this case handled several motions to quash, motions to compel, and motions for sanctions—in a case in which no depositions appear to have been taken. On April 21, 2015, Defendant was sanctioned $500.00 for failing to comply with a prior discovery order. Defendant immediately sought the magistrate

10

judge's reconsideration of the sanction order, (Doc. #94), which was denied (Doc. #102).

On May 11, 2015, Plaintiffs filed their Motion for Summary Judgment (Doc. #97). This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Civil Rule 56(c) and (e), that:

(a)     The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. The Statement shall include all necessary material facts that, if undisputed, would result in summary judgment for the movant.

(b)     In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order of the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

(c)     All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(d)     The statements shall be non-argumentative and avoid the use of color words or distortions of the record in a party's favor. Conclusory, speculative, or conjectural statements in support of a position shall be avoided. Hearsay statements and other inadmissible evidence cannot be considered.

(e)     Facts stated in the Statement of Material Facts Not In Dispute and Counter-Statement of Disputed Facts shall be supported with appropriate citations to the record, including but not limited to the pleadings, interrogatories, admissions, depositions, affidavits and documentary exhibits. Citations to the record must be **specific** i.e., cite to a discrete page or portion of deposition testimony or page(s) of documentary evidence, not simply the entire deposition or document. The appropriate portion of the text of a source cited shall be highlighted and filed with the Court as part of an appendix separate from the brief. It is preferred that only the cited excerpts of depositions, as opposed to the entire deposition, be filed. **The text cited shall**

11

> **be placed in proper context.** The appendix shall contain an index and shall
> be tabbed.

(Practice Guidelines of Judge Sean Cox, *available at*

http://www.mied.uscourts.gov/index.cfm?pageFunction=chambers&judgeid=22) (emphasis in

original).

Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment was due

no later than June 1, 2015. *See* E.D. Mich. LR 7.1. Defendant did not file a response to Plaintiffs'

motion on or before June 1, 2015. Accordingly, on June 9, 2015, this Court issued an Order for

Defendant to Show Cause, on or before June 16, 2015, why Plaintiffs' unopposed motion for

summary judgment should not be granted. (Order to Show Cause, Doc. #101).

Defendant filed a Response to the Show Cause Order on June 16, 2015. (Doc. #103). In that

Response, Defense counsel stated that his failure to timely respond to Plaintiffs' motion was due to

the fact that he was on vacation for the entire month of May, (Doc. #103 at 4), that he was only

checking his e-mails every two to three days, (*Id.*), and that he accidentally deleted the e-mail

notifying him that Plaintiffs had filed a motion in this case while he was cleaning out his inbox of

unwanted spam mail.[5] (Doc. #103 at 4–5). Defendant requested that this Court "excuse the non-

---

[5] As the Court later noted in its Order Denying Defendant's Motion for Reconsideration, the Court was not convinced that Defendant had absolutely no notice or knowledge that Plaintiffs had filed a Motion for Summary Judgment in early May:

> There were at least three filings on the docket in this case that generated e-mails to Defense counsel, which would have in turn placed Defense counsel on notice that Plaintiff had filed a motion for summary judgment in this case: 1) notice that Plaintiff filed a Motion for Summary Judgment on 5/11/15 (Doc. #97); 2) notice that Plaintiff filed a Statement of Material Facts Not IN Dispute on 5/11/15 (Doc. #98); and 3) Notice of Hearing on Doc. #97 Motion for Summary Judgment (Doc. #100).

filing and permit Defendant until June 30, 2015" to file a response to Plaintiffs' motion for summary judgment.

The Court vacated the June 9, 2015 Order to Show Cause and ordered Defendant to file a Response to Plaintiffs' Motion for Summary Judgment on or before June 22, 2015. (Order Vacating Show Cause, Doc. #104). In that Order, the Court specifically warned that "[i]f Defendant fails to file a response to Plaintiffs' Motion for Summary Judgment on or before June 22, 2015, or if Defendant's Response does not comply with the Local Rules or with this Court's Practice Guidelines, then the Response will not be accepted by the Court and Defendant shall be prohibited from participating in oral argument at the hearing on Plaintiffs' motion." (June 17, 2015 Order, Doc. #104 at 2).

Defendant's response, filed on June 23, 2014, did not comply with the Local Rules or this Court's Practice Guidelines. (*See* Order Striking Defendant's Summary Judgment Response, Doc.

---

   In its response to the Court's June 9, 2015 Show Cause Order, Defense counsel explained that his failure to timely file a response to Plaintiff's motion was because he was on vacation for the entire month of May, (Doc. #103 at 4), he was only checking his e-mails every two to three days, (*Id.*), and that he must have accidentally deleted the e-mail notifying him that Plaintiff had filed a motion in this case while he was cleaning out his inbox of unwanted spam mail. (Doc. #103 at 4–5).

   This may explain Defense counsel's alleged failure to receive or acknowledge the first e-mail he received (regarding Doc. #97), and perhaps even the second e-mail he received (regarding Doc. #98). However, Defense counsel has offered no explanation as to why, after he received the e-mail notification that a Notice of Hearing on Plaintiff's motion had been issued in this case on May 29, 2015, he nevertheless took no action to notify the Court of his error and request additional time to respond. Instead, Defense counsel waited an additional *eleven days* for this Court to issue a Show Cause Order. The Court finds that Defendant's failure to comply with Local Rule 7.1 was willfully and knowingly done, at least after May 29, 2015.

(Doc. #111 at p. 6 fn 5)

#109).  Specifically, Defendant's response 1) also contained a motion, which is a clear violation of Rule 5(e) of the Electronic Filing Policies and Procedures for the Eastern District of Michigan; 2) contained 11-point typeface, which has never been permissible in this Court; 3) did not contain a proper Counter-Statement of Material Facts, as required by this Court's Practice Guidelines, and 4) otherwise did not properly refute Plaintiffs' factual averments with specific citations to record evidence.  (Doc. #109).[6]

On June 29, 2015, for the reasons discussed above, this Court entered an Order Striking Defendant's Response to Plaintiffs' Motion for Summary Judgment and all accompanying documents.  (Order, Doc. #109).  The Court explained that the June 17, 2015 Order set forth the conditions under which it would accept Defendant's motion response, which at that time was already almost three weeks late, (Order, Doc. #109 at 5), and that Defendant failed to satisfy those conditions.

On July 2, 2015, Defendant filed a Motion for Reconsideration of this Court's June 29, 2015 Order striking its response to Plaintiffs' motion.  (Doc. #110).  Having found no palpable defect in its prior order, the Court denied Defendant's motion.  (Order Denying Motion for Reconsideration, Doc. #111).  The Court explained:

As set forth in this Court's June 29, 2015 Strike Order, Defendant's response brief

---

[6] Defendant's filings were rife with instances in which Defendant *appeared* to have intended to support its statements with evidence, but merely forgot to do so.  *See* Defendant's "Statement of Material Facts In Dispute," Doc. #106 at PageID# 1496 ¶ 9 ("ARM timely notified Ordos City, through Mr. Alan Hsueh, that the elevator was lost at sea.  **(Find e-mail to support)**"); *see also* Def.'s Response Brief, Doc. #105 at PageID# 1483 ("Thereafter, on or about DATE, ARM informed Hseuh that the Line 15 Rigging Agreement had been fully completed. (cite to record).").

14

does not comply with the Local Rules, (Doc. #109) and Defendant admits that its response does not comply with the Court's Practice Guidelines.  (Doc. #110, Ex. 1 at 18).  Therefore, Defendant has not satisfied the condition precedent for this Court to accept its tardy motion response.  Defendant now requests even *more* time to prepare its motion response, despite the fact that it is now more than five weeks past its original due date.  This Court's June 17, 2015 Order made clear that, should Defendant's response brief fail to comply with the Local Rules and/or Practice Guidelines, Defendant's response brief would not be received and Defendant would not be given additional time to bring its filing into compliance.  Defendant cannot now feign surprise at this Court's June 29, 2015 Order when its consequences were both foreseeable and avoidable.

(Doc. #111 at 7) (internal footnote omitted).  Accordingly, Defendant has not filed a response to

Plaintiffs' Motion for Summary Judgment that will be considered by this Court.[7]

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1984), quoting FED. R.

CIV. P. 56(C).

The party that moves for summary judgment has the burden of showing that there are no

genuine issues of material fact in the case.  *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376,

378 (6th Cir. 1993).  The moving party may meet its burden by showing that the nonmoving party

lacks evidence to support an essential element of its case.  *Barnhart v. Pickrel, Schaeffer & Ebeling*

---

[7] Defendant has continued to file motions out of turn and without permission.  On July 26, 2015, Defendant filed an "Offer of Proof Under Federal Rule 103(a)(2)."  (Doc. #112).  It is unclear what Defendant is attempting to accomplish with this filing, and it is uncertain whether there is any authority for the making of an offer of proof in response to the striking of a motion response.

15

*Co.*, 12 F.3d 1382, 1389 (6th Cir. 1993).  In response, the plaintiff must come forth with more than a "mere scintilla of evidence" in support of his or her position in order to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  "In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

The court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Civil Rule 56(c)(1) provides:

> (1)  Supporting Factual Positions.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A)    citing to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

This Court has subject matter jurisdiction over this case based on the diversity of citizenship of the parties, *see* 28 U.S.C. § 1332, and Plaintiffs' claims are based entirely on state law. Accordingly, this Court must apply the law of the forum state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).  "If the state's highest court has not decided an issue, then 'the federal court must ascertain the state law from all relevant data.'" *Wells Fargo Bank, NA v. MPC Investors, LLC*,

16

705 F. Supp. 2d 728, 735 (E.D. Mich. 2010) (quoting *Garden City Osteopathic Hosp. v. HBE Corp.*,

55 F.3d 1126, 1130 (6th Cir. 1995)). "Relevant data includes the state's intermediate appellate court

decisions, as well as the state supreme court's relevant dicta, restatements of the law, law review

commentaries, and the majority rule among other states." *Id.* (citation omitted).

## ANALYSIS

### 1)   Breach of Contract

####    A.   Plaintiffs' Breach of Contract Claim/Defendant's Breach of Contract Counterclaim Regarding The Line 15 Transportation Agreement

The crux of the parties' contractual dispute centers around interpretation of the Line 15

Transportation Agreement. Defendant argued at the preliminary injunction stage, and appears to

maintain in its breach of contract counterclaim, that the Line 15 Transportation Agreement required

ARM to transport only the "packaged machine components" of the Line 15 Equipment. Defendant

claims that Plaintiffs agreed to arrange for separate transportation of the larger "break bulk" portions

of the Line 15 Equipment.

Defendant's First Counterclaim is for "Breach of Written and Oral Agreements." (Amended

Counterclaims, Doc. #73 at 14). Defendant alleges that "Plaintiffs have breached the Line 15

Transportation Agreement in the manner more fully described in the Common Allegations above."

(Doc. #73 at ¶ 60). Based on Defendant's factual allegations, it appears that Defendant believes that

Plaintiffs breached the Line 15 Transportation Agreement and Amended Transportation Agreement

by failing to pay all amounts due under them. (Doc. #73 at ¶ 39). Defendant asserts that Plaintiffs

still owe a total of $750,000 under these two Agreements. Defendant maintains that it performed

all of its obligations under the Line 15 Transportation Agreement. (*Id*. at ¶ 62).

17

Defendant also alleges that Plaintiffs have "breached their obligations under the oral agreement relating to the performance of additional millwright work ordered by them and performed by [ARM] in the manner more fully described above . . . ." (Doc. #73 at ¶ 31). Defendant alleges that

> In mid-2013, Plaintiffs, through their authorized and designated representative Alan Hsueh repeatedly acknowledged that they still needed to make arrangements for transportation of the Break Bulk items; and, in preparation for same, directed [ARM] to perform millwright services to the Break Bulk items in an effort to reduce the weight of the Break Bulk equipment so as to make it easier to move. Plaintiffs agreed to pay for the additional millwright services upon presentment of an invoice (which was presented.).

(Doc. #73 at ¶ 44). Defendant claims it completed the millwright services at a cost of $223,850 and sent an invoice to Plaintiffs for the same, but that Plaintiffs have refused to pay. (Doc. #73 at ¶¶ 54, 55).

Plaintiffs argue that Defendant's first counterclaim fails because Defendant's repudiation of the contracts relieved Plaintiffs of their obligation to fully perform. Plaintiffs state the Line 15 Transportation Agreement required ARM to ship *all* portions of the Line 15 Equipment, not just the "packaged machine components." (Pl. Mo. at 3–8). Plaintiffs aver that because Defendant refused to complete transportation of all of the Line 15 Equipment to China, Defendant materially breached and repudiated the contract. Accordingly, Plaintiffs argue, they were relieved of their obligation to pay the remaining balances under the Line 15 and Amended Transportation Agreements. (Pl. Mo. at 8–9).

Resolution of Plaintiffs' breach of contract claim and Defendant's breach of contract counterclaim requires the Court to construe the Line 15 Transportation Agreement. First, in order to establish a breach of contract claim, "a plaintiff must establish both the elements of a contract and

18

the breach of it." *RSM Richter, Inc. v. Behr America, Inc.*, 781 F. Supp. 2d 511, 517 (E.D. Mich. 2011) (citing *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765 (1990)).

> The essential elements of a valid contract are: (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. Once the plaintiff establishes the elements of a contract, it must then establish that the contract was breached and damages resulting from the breach. Where performance is due under a contract, nonperformance constitutes a breach.

*Id*. (internal citations omitted).  The validity of the written contracts between the parties appears to be undisputed.

"Under Michigan law, when construing a contract or one of its provisions, the intentions of the parties govern." *Lotsadough, Inc. v. Comerica Bank*, 2012 WL 5258300 at *5 (E.D. Mich. 2012) (citing *First Nat. Bank of Ypsilanti v. Redford Chevrolet Co.*, 270 Mich. 116, 121 (1935)).  "To ascertain the parties' intentions, the Court looks first to the language in the written agreement." *Lotsadough, Inc.*, 2012 WL 5258300 at *5 (citing *Haywood v. Fowler*, 190 Mich. App. 253, 258 (1991)).  Intent should be discerned "in light of the surrounding circumstances and from a reading of the instrument as a whole."  *DaimlerChrysler Motors, L.L.C. v. Bill Davis Racing, Inc.*, 408 F. Supp. 2d 337, 345 (E.D. Mich. 2005) (citing *Cleveland v. Detroit Trust Co.*, 264 Mich. 253, 257 (1933)).

A clear and unambiguous contract must be construed "as a matter of law and enforced as written unless contrary to public policy."  *Id.* (citing *Quality Prods. and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375 (2003)).  "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided."  *Id.* (citation omitted).  Under Michigan law, extrinsic evidence may be cited "to disclose ambiguity or

to show that there is none, as well as to resolve any ambiguity proven to exist." *American Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 422 (6th Cir. 1984) (applying Michigan law).

"Where the language of the writing is not ambiguous the construction is a question of law for the court on a consideration of the entire instrument." *Lotsadough, Inc.*, 2012 WL 5258300 at *5 (quoting *In re Landwehr's Estate*, 286 Mich. 698, 702 (1938)). On the other hand, "[a]mbiguous contracts generally present questions of fact for trial." *MPC Investors*, 705 F. Supp. 2d at 736 (citing *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 469 (2003)).

Plaintiffs argue that the Line 15 Transportation Agreement is not ambiguous, and that it required Defendant to transport the entirety of the machine known as the Line 15 Equipment to China in exchange for the contract price. (Pl. Mo. at 3–4). This Court agrees. The Line 15 Transportation Agreement provides that "Agent [Defendant] will act on behalf of Customer [Plaintiff Inner Mongolia] to arrange and coordinate shipment of the Crossbar Line on behalf of Customer from the Twinsburg stamping plant to the Destination Port . . . ." (Pl. Ex. I). The Line 15 Transportation Agreement does not state that break bulk portions of the Crossbar Line are not covered under the Agreement. The term "Crossbar Line" refers to the entirety of the Line 15 Equipment, not just a portion of it.

Defendant would attempt to read ambiguity into the Line 15 Transportation Agreement by arguing that the phrase "packaged machine components" necessarily excludes portions of the Equipment that could not be "packaged," i.e. the large break bulk portions. However, the phrase "packaged machine components" was also used in other contracts between the parties, like the Line 7 Transportation Agreement. (Pl. Ex. E). The Line 7 Transportation Agreement provides that Plaintiff Ordos "desires to transport packaged machine components" from Twinsburg, Ohio to

20

China. (Pl. Ex. E). The Line 7 Transportation Agreement did not make any mention of excluding portions of the Line 7 Equipment. Ron Lech admitted at the preliminary injunction hearing that ARM transported the entirety of the Line 7 Equipment to China, not "packaged machine components" only. It stands to reason that, if the phrase "packaged machine components" did not include larger pieces of the Equipment that could not be packaged, then Defendant would not have shipped the entirety of the Line 7 Equipment under the Line 7 Transportation Agreement. The Court concludes that the Line 7 Transportation Agreement, and the parties' conduct pursuant thereto, shows that the phrase "packaged machine components" as used in the Line 15 Transportation Agreement is not ambiguous.

Ron Lech admitted at the preliminary injunction hearing that the Line 15 Rigging Agreement "covered the entire machine." (Lech Trans., Pl. Ex. H at Page ID# 1295–96). Ron Lech also admitted at the preliminary injunction hearing that there are no documents or e-mails supporting Defendant's position concerning the break bulk items, despite the fact that there are dozens of other e-mails and documents in which the parties discuss transportation of the Line 15 Equipment. As Plaintiff argues, "ARM's construction makes no sense in the context of the parties' dealings." (Pl. Mo. at 4). It seems unlikely and unreasonable that Plaintiffs would hire Defendant to perform all of the rigging services for the Line 15 Equipment but to deliver only half of it to Plaintiffs in China.

Even if the parties did have discussions regarding exclusion of the break bulk items from the Line 15 Transportation Agreement, the Court finds that any prior agreement reached during those discussions would be extinguished by the merger clause contained in the contract. "A written integration clause is conclusive evidence that the parties intended the document to be the final and complete expression of their agreement." *ADR N. Am., L.L.C. v. Agway, Inc.*, 303 F.3d 653, 658 (6th

21

Cir. 2002) (citing *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich. App. 486, 579 N.W.2d 411, 418 (1998)). "Under Michigan's parol evidence rule, prior agreements or negotiations cannot contradict the terms of a document intended to be the final and complete expression of the parties' agreement." *Id.* at 657 (citing *Am. Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 422 (6th Cir. 1984)). Because discussions of the break bulk items are alleged to have occurred before the Line 15 Transportation Agreement was executed, but no mention of break bulk items is included in that Agreement, the merger clause establishes that the parties did not intend to exclude break bulk items from the Agreement.

The Court finds that the Line 15 Transportation Agreement unambiguously required Defendant to transport the entirety of the Line 15 Equipment to China. It is undisputed that, at some point, Defendant refused to transport the break bulk portions of the Equipment without Plaintiffs paying additional monies not required under the contract. (Verified Compl. at ¶ 34). The Court concludes that this constitutes a breach of the contract. 223 Williston on Contracts § 63:1 (4th ed.) ("A breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract.").

Plaintiffs argue that Defendant's breach was material, such that it excused Plaintiffs' nonpayment under the Line 15 Transportation Agreement and Amended Transportation Agreement. "In determining whether a breach is material, the court should consider whether the nonbreaching party obtained the benefit it reasonably expected to receive." *Omnicom of Michigan v. Giannetti Inv. Co.*, 221 Mich. App. 341, 348 (1997) (citing *Holtzlander v. Brownell*, 182 Mich. App. 716, 721 (1990)). "Other considerations include the extent to which the injured party may be adequately compensated for damages for lack of complete performance, the extent to which the breaching party

has partly performed, the comparative hardship on the breaching party in terminating the contract, the wilfulness of the breaching party's conduct, and the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract." *Id.* (citing *Walker & Co. v. Harrison*, 347 Mich. 630, 635 (1957)).

Here, the Court concludes that Defendant's breach of the Line 15 Transportation Agreement was material. Under the Agreement, Defendant agreed to arrange for transportation of the Line 15 Equipment to China for a Contract Price of $1,050,000. (Pl. Ex. I). Under the Amended Transportation Agreement, Plaintiffs agreed to pay Defendant an additional $700,000 to secure Defendant's performance under the Line 7 and Line 15 Transportation Agreements. (Pl. Ex. L). The Amended Transportation Agreement provides that "[i]n no event will [Plaintiffs] be responsible to ARM for any amount over the amounts set forth in the Transportation Agreements plus the Additional $700,000." (Pl. Ex. L. at ¶ 3(e)). Yet, in October 2013, Defendant demanded additional money from Plaintiffs in order to complete the services required of it under the Line 15 and Amended Transportation Agreements. (Pl. Stmt. of Facts at ¶ 34). Defendant refused to complete performance under the contract's terms, and Plaintiffs did not receive the benefit they expected under the contract, to wit, receipt of the entirety of the Line 15 Equipment in China. Accordingly, Defendant materially breached the contract.

"A breach by one party to a contract excuses the performance of the other party, who may then recover damages sustained by the breach." *Baker v. Abramson*, 2005 WL 3304563 (Mich. Ct. App. 2005) (citing *Thomas Canning Co. v. Johnson*, 212 Mich. 243, 252–53 (1920)); *see also* 17A Am. Jur. 2d Contracts § 685 ("[I]n the case of bilateral contracts, if either party commits a material breach of the contract, the other party should be excused from the obligation to perform further.").

23

Therefore, because Defendant materially breached the contract by failing/refusing to perform, Plaintiffs were excused from completing performance under the Line 15 and Amended Transportation Agreements. Accordingly, Defendant cannot maintain an action for breach of written contracts. The Court shall GRANT Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaim One insofar as Defendant alleges breach of the written contracts. The Court shall GRANT Plaintiffs' Motion for Summary Judgment on Plaintiffs' Count Four (Breach of Contract) insofar as it concerns Defendant's breach of the Line 15 Transportation Agreement and Amended Transportation Agreement.

Defendant also alleges in Counterclaim One that the parties had an oral contract for performance of additional millwright services. Defendant claims that Alan Hsueh asked ARM to further dismantle the Line 15 Equipment to ready it for shipment, but refused to pay for the services once they were completed.

The Court finds that Defendant's oral contract claim fails because Defendant has presented no evidence that such an oral contract existed between the parties. The Court need not determine whether or not the "additional millwright services" were contemplated under the fixed price of the Line 15 Rigging Agreement because Defendant has presented no evidence supporting its interpretation of the Line 15 Rigging Agreement. The Court shall GRANT Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaim One.

**B)    Breach of Contract Concerning Insurance Proceeds and the Line 7 Elevator**

Plaintiffs allege that one of the ways Defendant breached the Amended Transportation Agreement was by "failing to construct the replacement elevator" that was part of the Line 7 Equipment and was lost at sea during transportation. (Verified Compl. at ¶ 70). Plaintiffs assert that

24

the Line 7 Transportation Agreement assigned to Defendant "all the risk of loss to the Line 7 Equipment during transportation to China and obligated ARM to procure insurance to cover this risk." (Pl. Mo. at 24, *citing* Line 7 Trans. Agreement, Pl. Ex. E at §§ 1.8 and 3.1). Defendant insured the Line 7 Equipment through Traveler's Insurance ("Traveler's").

It is undisputed that the Line 7 elevator was lost at sea. Plaintiffs further state that, in January 2012, ARM submitted a claim to Traveler's for the lost elevator. (Claim Correspondence, Pl. Ex. J). Plaintiffs and Defendant entered into an agreement for Defendant to "obtain[] or construct[] the Line 7 equipment, specifically the elevator, lost at sea January 2012." (Amended Trans. Agreement, Pl. Ex. L at ¶ 3(i)). In fact, Defendant was the lowest bidder for the Line 7 Elevator reconstruction job. (Claim Correspondence, Pl. Ex. J at PageID# 1333, 1339). On or about February 19, 2013, Traveler's paid Defendant the $975,000.00 it had approved for Defendant to complete reconstruction of the Line 7 Elevator. (Elevator Claim Payment Doc., Pl. Ex. K). There is no dispute that Defendant has not rebuilt the Line 7 Elevator, nor has Defendant paid any portion of the insurance proceeds to Plaintiffs for replacement of the Line 7 Elevator.

Defendant, through its pleadings, does not appear to dispute the validity of the Line 7 Transportation Agreement or the Amended Transportation Agreement. Further, Plaintiff has presented unrefuted evidence that Defendant agreed to rebuild Plaintiffs' Line 7 Elevator using the insurance proceeds paid to it by Traveler's, but failed to do so. Because Defendant had a duty to perform but did not, Defendant breached the parties' contract. The Court shall enter judgment on liability in Plaintiffs' favor on Count Four of Plaintiffs' Verified Complaint.[8]

_____

[8] The Court shall leave the issue of damages regarding the lost elevator for determination at trial.

25

**2)      Promissory Estoppel**

Defendant's Promissory Estoppel counterclaim appears to be premised on Defendant's allegation that Plaintiffs asked Defendant to perform additional millwright services on the Line 15 Equipment that they later refused to pay for.  (Doc. #73 at 15).  In order to prove a promissory estoppel claim, Defendant must show that "(1) there was a promise, (2) the promisor reasonably should have expected the promise to cause the promisee to act in a definite and substantial manner, (3) the promisee did in fact rely on the promise by acting in accordance with its terms, and (4) and the promise must be enforced to avoid injustice."  *Crown Tech. Park v. D&N Bank, F.S.B.*, 242 Mich. App. 538, 548–49 (2000).  Defendant has offered no evidence in support of any of these elements.  Therefore, the Court shall GRANT summary judgment to Plaintiffs on this counterclaim.

Plaintiffs also argue that Defendant's promissory estoppel counterclaim should be dismissed because the subject matter of the alleged promise (the additional millwright work) is already the subject matter of an express contract (the Line 15 Rigging Agreement).  (Pl. Mo. at 12).  As discussed above, because of the dearth of evidence presented by Defendant, the Court need not consider whether the additional millwright services were contemplated as being required under the Line 15 Rigging Agreement.

**3)      Conversion**

Under the Line 7 Transportation Agreement, Defendant was responsible for leasing or purchasing shipping containers to be used in the transportation process.  (Pl. Ex. E at 1).  In Defendant's third counterclaim for "Conversion," Defendant alleges that Plaintiffs retained possession of the shipping containers used to ship the Line 7 Equipment even though Defendant demanded that they be returned.  (Doc. #73 at 17–18).

Plaintiffs respond that because the Line 7 Transportation Agreement included a purchase agreement for the containers, and because the purchase price was included in the fixed price of the contract, it is implied that Plaintiffs were permitted to keep the shipping containers.  (Pl. Mo. at 15).

"In the civil context, conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."  *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391 (1992).

> A conversion may be committed by (a) intentionally dispossessing another of a chattel, (b) intentionally destroying or altering a chattel in the actor's possession, (c) using a chattel in the actor's possession without authority so to use it, (d) receiving a chattel pursuant to a sale, lease, pledge, gift or other transaction intending to acquire for himself or for another a proprietary interest in it, (e) disposing of a chattel by a sale, lease, pledge, gift or other transaction intending to transfer a proprietary interest in it, (f) misdelivering a chattel, or (g) refusing to surrender a chattel on demand.  However, liability for conversion does not arise under terms of this section if the actor is privileged to dispose of the chattel.

*Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 438 (1960) (citing 1 Restatement, Torts, § 222).

Contrary to Plaintiffs' assertion, it is not clear from the text of the Line 7 Transportation Agreement that Plaintiffs are entitled to retain possession of the shipping containers.  The Line 7 Transportation Agreement allowed for Defendant to lease the shipping containers, which surely would have required Plaintiffs to return them to Defendant, so that Defendant could then return them to the lessor.

However, Defendant has presented no evidence in support of its conversion counterclaim. Defendant has no evidence showing that the shipping containers are its property, that Defendant has demanded return of the containers, or that Plaintiffs refuse to return the containers.  Because Defendant has offered no evidence in support of its conversion counterclaim, the Court finds that summary judgment in Plaintiffs' favor on Defendant's conversion counterclaim is appropriate.

27

**4)      Tortious Interference With A Business Relationship[9]**

Defendant's fourth counterclaim is for "Tortious Interference With A Business Relationship." (Doc. #73 at p. 18–19).  Defendant alleges that Plaintiffs intentionally interfered with Defendant's business relationship with Twinsburg Industrial, causing Twinsburg to end its relationship with ARM.  (*Id.*).  Twinsburg and ARM thereafter became engaged in litigation in the Northern District of Ohio.

Plaintiffs argue that they had "nothing to do" with Twinsburg's decision to terminate its relationship with Defendant.  Rather, Plaintiffs maintain that Twinsburg's decision to evict Defendant from its property was due to "Twinsburg's own need to develop the property."  (Pl. Mo. at 16).

"The elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted."  *Health Call v. Atrium Home & Health Care Servs.*, 268 Mich. App. 83, 89–90 (2005).  In order to prevail on a tortious interference claim, Defendant must plead and prove that Plaintiffs committed a per se wrongful act, or committed a lawful act "with malice . . . for the purpose of invading the contractual rights or business relationship of another . .

---

[9] In its now-stricken response to Plaintiffs' motion, Defendant agrees that its claims for contribution/indemnity, negligence, and tortious interference claims lack the factual support to survive summary judgment.  (Doc. #105, under seal, at p. 26 n. 6).

28

. ."  (Pl. Resp. at 16) (quoting *Knight Enterprises v. RPF Oil Co.*, 299 Mich. App. 275, 280–81 (2013)).

Again, because Defendant has presented no evidence supporting the allegation that Plaintiffs intentionally interfered with Defendant's relationship with Twinsburg Industrial, or that any such interference was the cause of the breakdown of that business relationship, the Court shall grant Plaintiffs' motion for summary judgment as to Defendant's tortious interference counterclaim.

**5)   Fraudulent Inducement**

In Defendant's fifth counterclaim, titled "Fraudulent Inducement," Defendant alleges that, in order to induce it to enter into the Line 15 Transportation Agreement, "Plaintiffs made an actual or implied false representation that it would later, after the packaged machine components had been transported, make its own arrangement and additional contracts with [ARM] to transport the Break Bulk equipment."  (Doc. #73 at pp. 19–20).  Plaintiffs respond that this counterclaim is barred by the merger clause of the Line 15 Transportation Agreement, unless Defendant can show that the merger clause itself was procured by fraud.  (Pl. Mo. at 18).

"To prove a claim of fraud in the inducement, a plaintiff must establish the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that [it] was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage."  *Johnson v. Johnson*, 2013 WL 2319473 (Mich. Ct. App. May 28, 2013).  "Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party."  *Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 274 Mich. App. 239,

29

243 (2006).

Defendant has presented no evidence that Plaintiffs made any misrepresentation to Defendant concerning the break bulk pieces of the Line 15 Equipment. Nor has Defendant proffered any evidence to support any other element of a *prima facie* fraudulent inducement claim. Furthermore, the Court finds that the merger clause would likely operate to extinguish any oral agreement that pre-dated the Line 15 Transportation Agreement. *UAW-GM Human Resources Ctr. v. KSL Recreation Corp.*, 228 Mich. App. 486, 503 (1998) ("[W]hen a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause."). Accordingly, the Court finds that Plaintiffs are entitled to summary judgment on Defendant's fraudulent inducement counterclaim.

**6)    Negligence**

In Counterclaim Six, entitled "Negligence," Defendant alleges that, "[i]n the conduct of their affairs as to the Line 7 and Line 15 Equipment, including arranging for transportation of those items and fulfilling their contract obligations, Plaintiffs each owed duties of care and good faith to [ARM] to . . . avoid harm to [ARM]." (Doc. #73 at ¶ 104). Defendant alleges that Plaintiffs breached these duties "in the manner more fully described in the common allegations above." (Doc. #73 at ¶ 105). It appears that Defendant believes Plaintiffs were negligent by failing to arrange for transportation of the break bulk portions of the Line 15 Equipment, which then had to remain on the Twinsburg Industrial property beyond expiration of Defendant's lease with Twinsburg.

Plaintiffs argue that Defendant's negligence counterclaim fails because "a plaintiff may not assert a tort claim against a defendant with whom he had a contractual relationship unless the duty

30

that the defendant allegedly breached is distinct from a duty owed under the contract between the parties." (Pl. Mo. at 19, citing *Hart v. Ludwig*, 347 Mich. 559 (1956) and *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 466 (2004)).

Plaintiffs' position is well-taken. At base, Defendant is alleging that Plaintiffs were negligent by failing to fulfill their duties under the alleged oral and written contracts between the parties—including the Line 15 Transportation Agreement, as well as the alleged oral agreement that Plaintiffs would arrange for transportation of the Line 15 break bulk items. Thus, the Court finds that Defendant is essentially alleging that Plaintiffs were negligent because they breached contracts. Under well-settled Michigan law, "a tort action will not lie when based solely on the nonperformance of a contractual duty." *Fultz*, 470 Mich. at 466; *see also Hart*, 347 Mich. at 563 ("As a general rule, there must be some active negligence or misfeasance to support tort. There must be some breach of duty distinct from breach of contract."); *Rinaldo's Construction Corp. v. Mich. Bell Telephone Co.*, 454 Mich. 65, 83 (1997) ("The threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation."); *Davis v. Venture One Const., Inc.*, 568 F.3d 570, 574 (6th Cir. 2009) ("The rule in *Hart*, adopted and applied in *Fultz*, is summarized simply: the 'defendant's failure to complete his contracted-for performance' does not give rise to a tort action for lack of duty.").

Because Defendant cannot premise a negligence action on Plaintiffs' alleged failure to fulfill contractual duties, the Court shall grant Plaintiffs' motion for summary judgment as to the Defendant's negligence counterclaim.[10]

---

[10] The Court further notes that Defendant has produced no evidence establishing the elements of a negligence claim, i.e. duty, breach, causation or damages.

**7)    Declaratory Relief and Artisan's Lien and Foreclosure**

Defendant's seventh counterclaim is for "Declaratory Relief." (Doc. #73 at 21). Defendant seeks a declaration that it has acquired lien rights under M.C.L. § 570.186[11] to the Line 15 Equipment. Defendant's counterclaim eight, entitled "Artisan's Lien and Foreclosure" seeks to foreclose on the artisan's lien that is the subject of counterclaim seven. (Doc. #73 at 22).

Plaintiffs argue that Defendant has failed to establish any lien rights under Ohio law. Plaintiffs also argue that Defendant cannot assert any valid lien rights to the Line 15 Equipment because the "additional millwright services" upon which the lien is based were required under the fixed price contracts, and additional charges were explicitly precluded. (Pl. Mo. at 20).

There appears to be some dispute about the basis for Defendant's artisan's lien claim. Defendant asserts here that it has a valid artisan's lien claim under Michigan law,[12] but Plaintiffs argue that Defendant does not have a valid artisan's lien claim under Ohio law. This dispute ultimately proves to be immaterial. The validity of Defendant's asserted artisan's lien, under either Michigan or Ohio law, is dependent upon interpretation of the Line 15 Rigging Agreement. If Plaintiffs' interpretation of the Line 15 Rigging Agreement is correct, then Defendant's artisan's lien

---

[11] M.C.L. § 570.186 provides: "When any person shall deliver to any mechanic, artizan or tradesman, any watch, clock, article of furniture or jewelry, implement, clothing or other article of value, to be altered, fitted or repaired, such mechanic, artizan or tradesman shall have a lien thereon for the just value of the labor and skill applied thereto by him, and may retain possession of the same until such charges are paid." M.C.L. § 570.187 provides the enforcement mechanism of the lien, which includes public sale of the item on which the lien is based. A person who has a lien under M.C.L. § 570.186 may also "commence a suit for the recovery of such charges in a court of competent jurisdiction against the person liable for the payment thereof." M.C.L. § 570.188.

[12] In November 2013, Defendant placed written notice on the Line 15 equipment located in Twinsburg, Ohio that Defendant was asserting an artisan's lien under Ohio law.

32

claim fails.  As discussed in Section 2, *supra*, Defendant has not produced[13] any evidence supporting

its interpretation, or refuting Plaintiffs' interpretation, of the Line 15 Rigging Agreement.  Nor has

Defendant submitted any evidence, argument, or authority supporting a declaration that Defendant

has a valid artisan's lien, or that foreclosure on that property is warranted.  Accordingly, Defendant

has not established that it has a valid artisan's lien under either Ohio or Michigan law.

For these reasons, the Court shall grant Plaintiffs' motion for summary judgment as to

Defendant's counterclaims seven and eight.  The Court also orders that Plaintiffs may liquidate and

discontinue the $226,850.00 Letter of Credit now deposited with Comerica Bank.

## 8)       Indemnity And/Or Contribution

In Defendant's ninth counterclaim, Defendant alleges that it is entitled to indemnity[14] and/or

contribution[15] from Plaintiffs for any damages Defendant suffers as a result of its litigation[16] with

Federal Marine Terminal ("FMT").  FMT sued Defendant in a separate case over an erroneous load

plan for shipment of the Line 7 Equipment, which required FMT to do additional work to load the

---

[13] Defendant's proffered response brief, which this Court did not accept, does not contain any evidence supporting Defendant's interpretation of the Line 15 Rigging Agreement.  *See* footnote 18, *infra*.

[14] Indemnity, as Defendant appears to be using it here, is defined as "[t]he right of an injured party to claim reimbursement for its loss, damage, or liability from a person who has such a duty." *Indemnity*, Black's Law Dictionary (10th ed. 2014).

[15] A contribution claim is "[a] defendant's claim to recover part of his or her liability to a plaintiff from another defendant or some third party who, it is asserted, should share in the liability." *Contribution Claim*, Black's Law Dictionary (10th ed. 2014).

[16] *Fed. Marine Terminals, Inc. v. Dimond Rigging Company, LLC*, Case No. 13-01329, (N.D. Ohio).  This case was closed on May 19, 2015.  The court entered judgment in favor of Plaintiff in the amount of $235,243.43.  (Case No. 13-01329, Doc. #75).  ARM filed a Notice of Appeal on June 18, 2015.  (*Id*. at Doc. #79).

Line 7 Equipment onto its ship for transportation.  FMT charged Defendant $158,000 for the additional work, but Defendant refused to pay.  (Doc. #73 at 4).  Defendant maintains that Plaintiffs are responsible for any damages sustained by FMT, and that Defendant is entitled to indemnity and/or contribution for the same.

Defendant makes numerous factual allegations regarding the relationship between Plaintiffs, Defendant, and FMT.  For example, Defendant alleges 1) that Plaintiff Ordos "interfered with [ARM's] logistical decisions and efforts on numerous occasions including but not limited to, insisting, at added expense to [ARM], that a single ship . . . be used . . . ."; 2) that [ARM] hired FMT to ship the Line 7 Equipment; 3) that "[p]rior to completion of the loading of the ship, a load meeting was held wherein representatives of all interested parties *except* [ARM], were invited and participated . . . ." and 4) that FMT thereafter made changes to the shipping plan at Plaintiffs' direction, for which FMT then charged [ARM].  (Doc. #73 at ¶¶ 4, 8, 9, 10–12).

Plaintiffs argue that contribution does not apply in contract cases like this one, and that Defendant is not entitled to indemnity.  The Court need not reach these arguments because Defendant has proffered no evidence in support of this counterclaim.[17]  Therefore, the Court shall grant Plaintiffs' motion for summary judgment regarding Defendant's ninth and final counterclaim for indemnity and/or contribution.

## CONCLUSION

Based on the foregoing, the Court shall GRANT Plaintiffs' Motion for Summary Judgment

---

[17] Indeed, as stated above, Defendant concedes it has no evidence to support this claim.

34

in its entirety.[18] All of Defendant's Amended Counterclaims are DISMISSED. The Court shall enter judgment on liability in favor of Plaintiffs on Count Four of the Verified Complaint. The Court hereby ORDERS that Plaintiffs may dissolve the $226,850.00 Letter of Credit, now held by Comerica Bank, to which Defendant is a named beneficiary.

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: August 20, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 20, 2015, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

---

[18] Even if the Court had not stricken Defendant's untimely and noncompliant response to Plaintiffs' motion, summary judgment would still be appropriate because Defendant has no evidence attached to his proffered motion response showing that Plaintiffs agreed to pay Defendant for additional millwright work. Ron Lech has submitted an eleven (11) page affidavit, but does not state that Plaintiffs asked for, or promised to pay for, Defendant's additional millwright work. (See Doc. #108 at Ex. A). Nor has Defendant proffered any other evidence supporting its interpretation of the Line 15 Rigging or Transportation Agreements.

In fact, Ron Lech's affidavit does not support any of Defendant's counterclaims. Much of Ron Lech's affidavit is devoted to establishing the illegal "kickback" or "bribe" scheme in which Defendant alleges Plaintiffs were involved. The other 13 exhibits attached to Defendant's proffered motion response also center around the purported kickback scheme. Even if Defendant's motion response had been accepted, the Court finds that its analysis of Plaintiffs' Motion for Summary Judgment would largely be the same.